**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **Touchstream Technologies, Inc.**,<br><br>*Plaintiff*,<br><br>*v*.<br><br>**Altice USA, Inc.; Cequel Communications, LLC; CSC Holdings, LLC; and Friendship Cable of Texas, Inc.,**<br><br>*Defendants*. | Case No. 23-cv-00060<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Touchstream Technologies, Inc., hereby files this Original Complaint for Patent Infringement against Altice USA, Inc., Cequel Communications, LLC, CSC Holdings, LLC, and Friendship Cable of Texas, Inc.(collectively "Defendants") and alleges, upon information and belief, as follows:

**THE PARTIES**

1. Plaintiff Touchstream Technologies, Inc., d/b/a Shodogg ("Touchstream" or "Plaintiff") is a Delaware corporation with its principal place of business in South Dakota.

2. Defendant Altice USA, Inc. is a Delaware corporation with its principal place of business at One Court Square West, Long Island City, New York, 11101. Altice USA may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

3. Defendant Cequel Communications, LLC is a Delaware Limited Liability Company with its principal place of business at 520 Maryville Centre Drive, Suite 300, St. Louis, Missouri 63141.

Cequel Communications, LLC may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington Delaware 19808.

4. Defendant CSC Holdings, LLC is a Delaware Limited Liability Company with its principal place of business at 1111 Stewart Avenue, Bethpage, New York 11714. CSC Holdings, LLC may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington Delaware 19808.

5. Defendant Friendship Cable of Texas, Inc. is a Texas for-profit corporation with its principal place of business at One Court Square, Long Island City New York, 11120.

**NATURE OF THE ACTION**

6. This is a civil action against Defendants for patent infringement arising under the patent statutes of the United States, 35 U.S.C. § 271 *et seq*. for the infringement of United States Patents No. 8,356,251 (the "'251 patent"), No. 11,048,751 (the "'751 Patent"), No. 11,086,934 (the "'934 Patent") (alternatively, "the Touchstream Patents"). A true and correct copy of the '251, '751, and '934 patents are attached respectively as Exhibits 1, 2, and 3 to this Complaint.

**JURISDICTION AND VENUE**

7. This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

8. This Court has personal jurisdiction over Defendants in this action because Defendants have committed acts within the Eastern District of Texas giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Defendants have engaged in continuous, systematic, and substantial activities within this State, including

substantial marketing and sales of products—including the Optimum and Altice products[1] that are used by Defendants in connection with performing the accused Optimum and Altice functionalities[2]—within this State. Furthermore, Defendants—directly and/or through subsidiaries or intermediaries—have committed and continue to commit acts of infringement in this District by, among other things, selling, offering to sell, and using the Optimum and Altice services.

9. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b). As discussed above, Defendants currently have a regular and established place of business in this District, and have committed and continues to commit acts of patent infringement in this District.

10. Defendants operate a significant customer care center in the Eastern District of Texas, in the town of Tyler. Further, Defendants maintain permanent physical presences within the Eastern District of Texas, conducting business from numerous locations, including at least 25 19th Street SE, Paris, Texas 75460; 1847 Troup Highway, Suite 300 Green Acres, Tyler, Texas 75701; 4949 S Broadway Avenue, Tyler, Texas 75703; 409 N Fredonia Street, Nacogdoches, Texas 75961; and 4505 S Medford Drive, Suite 103, Lufkin, TX 75901

11. On information and belief, Defendants maintain established presences in the counties of Jefferson, Collin, Cooke, Bossier, Wagoner, Tyler, Hopkins, Nacogdoches, and Smith.

12. Defendants directly and/or indirectly test, distribute, market, offer to sell, sell, and/or utilize the Optimum products that Altice uses to perform the accused Optimum functionalities in the Eastern District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its Optimum products.

---

[1] The Optimum and Altice products are defined at ¶¶ 32 *et. seq.*, *infra*.
[2] The accused Optimum and Altice functionalities are defined at ¶¶ 32, *et. seq.*, *infra*.

**TOUCHSTREAM'S PATENT**

13. In 2010, David Strober, the inventor of the Touchstream Patents and the original founder of Touchstream, was working at Westchester Community College as a Program Manager and e-learning instructional designer. At this job Mr. Strober facilitated the development of online college courses, developing software as needed to support those efforts.

14. At least as early as mid-2010, Mr. Strober perceived the need to be able to take videos that could be viewed on a smaller device, like a smartphone, and "move" them to a larger screen, like a computer monitor or television. In working to bring his idea to fruition, Mr. Strober expanded his work by using a device like a smartphone to cause a video to play on a second screen, even if that video resided elsewhere (like the public internet). Near the end of 2010, Mr. Strober had developed a working prototype that demonstrated his groundbreaking concept. Recognizing that that his invention could revolutionize how people located, viewed, and shared media, Mr. Strober filed his first patent application in April 2011.

15. The Touchstream Patents are not directed to an abstract idea, but are limited to a specific, concrete messaging architecture. The claims require various components to send or receive signals (or messages) to control the playback of videos from various media players over a network, with precise requirements varying by claim. They do not cover all forms of remote control of content over a network. Specific steps must be performed in their specified order. Steps include, *inter alia*:

- Assigning a synchronization code to a display device by a server system;
- Receiving a message in the server system including the synchronization code;
- Storing a record in the server system based on the synchronization code;
- Receiving signals specifying a video file and identifying a particular media player;
- Including the synchronization code and a universal playback control command in the messages;

- Converting the universal playback control command to corresponding programming code; and

- Storing in a database information that specifies the video file to be acted upon, identifies the media player, and includes the corresponding programming code.

Further, Mr. Strober's improvements in this area do not reflect routine nor conventional steps. The arrangement of components and steps themselves is inventive, enabling, among other things, using different media players, associating different devices with a synchronization code, and coordinating between a personal computing device and display device loading a plurality of media players, video files, and control commands.

16. The Touchstream Patents, which are each entitled "Play Control of Content on a Display Device," each claim priority to U.S. Provisional Patent Application No. 61/477,998 (filed on April 21, 2011).

17. On January 15, 2013, the U.S. Patent and Trademark Office duly and legally issued the '251 patent to inventor David Strober. On June 29, 2021, the U.S. Patent and Trademark Office duly and legally issued the '751 Patent to inventor David Strober. On August 10, 2021, the U.S. Patent and Trademark Office duly and legally issued the '934 Patent to inventor David Strober.

18. Touchstream is the owner, by assignment, of all rights, title, and interest in the '251 Patent, the '751 Patent, and the '934 Patent.

## BACKGROUND OF THE DISPUTE

### TOUCHSTREAM REVOLUTIONIZES VIDEO STREAMING

19. In 2011, inventor David Strober officially incorporated Touchstream to share his inventions with the world.

20. In the following years, Touchstream raised millions of dollars in investments.

21. Since 2011, Touchstream, d/b/a "Shodogg," developed software that enables content to be wirelessly cast (e.g., accessed, displayed, and controlled) from a mobile device to a second display screen (e.g., TV, computer, tablet, etc.). Touchstream has been a leader in developing casting technology and has received numerous awards and recognition.

22. Unfortunately, the efforts of Touchstream and Touchstream's partners to appropriately monetize Mr. David Strober's inventions were significantly hindered by infringement of the Touchstream Patents, including by Defendants. The timing and scope of Defendants' infringement is discussed in more detail below.

**DEFENDANTS MEET WITH TOUCHSTREAM IN 2011**
**TO LEARN ABOUT THE PATENTED TOUCHSTREAM TECHNOLOGY**

23. Since at least December 14, 2011, Touchstream has made publicly clear that its revolutionary product offerings were "patent-pending."[3]

24. Just days after the first Touchstream Patent issued on January 15, 2013, Touchstream issued a press release announcing this patent award.[4]

[3] *See e.g.*, Sean Ludwig, *Shodogg will let you pause and restart video from any device (exclusive)*, VentureBeat (Dec. 14, 2011 7:00 AM), https://venturebeat.com/2011/12/14/shodogg-video-sharing-phones-tvs-exclusive/; Shodogg, *Shodogg Launches at CES and Transforms Streaming Video Delivery by Fueling Industry Expansion with Content Providers*, Cision PR Newswire (Jan. 10, 2012, 9:43 ET), https://www.prnewswire.com/news-releases/shodogg-launches-at-ces-and-transforms-streaming-video-delivery-by-fueling-industry-expansion-with-content-providers-137010098.html; *see also* https://web.archive.org/web/20111003131546/http://shodogg.com/ (archived snapshot of Shodogg website from October 3, 2011) ("Shodogg is a patent-pending technology that allows viewers to access online streaming content from any smartphone and display it to any larger connected screen, such as a laptop, tablet, or TV.").

[4] Shodogg, *Shodogg announces the release of ScreenDirect a business-to-business solution enabling companies to seamlessly direct digital content across screens*, Cision PR Newswire (Jan. 17, 2013 9:15 ET) https://www.prnewswire.com/news-releases/shodogg-announces-the-release-of-screendirect-a-business-to-business-solution-enabling-companies-to-seamlessly-direct-digital-content-across-screens-187284641.html; *See also, e.g., Meet Shodogg Who Won this Year's Techweek NYC Launch Competition,* AlleyWatch (12/2014), https://www.alleywatch.com/2014/12/meet-shodogg-who-won-this-years-techweek-nyc-launch-competition/.

25. Beginning in August 2011, Touchstream and Altice began discussing a potential partnership concerning the technology invented by Touchstream. Discussions continued through at least December of 2011. It was Touchstream's pattern and practice to inform actual or potential business partners of its patents and/or pending patent applications when meeting.

26. In October of 2011, multiple Touchstream employees presented to Altice. Touchstream met at an Altice office, demonstrated the technology, and informed them it was patent-pending. Touchstream further provided a patent application number to Altice at this meeting. As such, Altice knew about the patent applications leading to the Touchstream Patent by no later than October 2011.

27. Altice also knew, or at the very least should have known, of the issued Touchstream Patent on or shortly after the date each such patent was issued, beginning with the '251 Patent that issued in January 2013.

28. At no point did Altice reach out to Touchstream about potentially acquiring a license to Touchstream's pending or awarded patent, and to this day Altice has not requested or received a license to the Touchstream Patent.

**ALTICE UNVEILS ITS INFRINGING SERVICES**

29. On information and belief, Altice unveiled its Altice One and Optimum TV products—which perform the infringing functionalities—in 2017.[5] On information and belief, Altice One and Optimum TV are the same product, with only different branding between them.

30. As of December 31, 2020, Altice announced it had 2.9 million video customers.[6]

[5] *See, e.g.*, Apple, *App Store Preview: Optimum TV*, https://apps.apple.com/us/app/optimum-tv/id1296704509 (indicating copyright 2017).

[6] Altice USA, Inc., Form 10-K, at 3 (Dec. 2020)

**THE ACCUSED ALTICE ONE AND OPTIMUM TV FUNCTIONALITIES**

31. The accused Altice One and Optimum TV functionalities comprise the methods performed through operation of at least the Altice set top box ("STB") devices as well as the Altice One and Optimum TV mobile applications. The accused products did provide in the past, and continue to provide, functionality and structure that facilitates the controlling of content, such as audio and/or video content, on a content presentation device that loads any one of a plurality of different media players described in further detail below.

Optimum TV

Turn every screen into a TV

You're in command of your entertainment

Keep up with your favorite shows no matter where you are with the Optimum TV App. Watch them on all your devices wherever your day takes you.

Plus, with the TV to GO feature, you can enjoy extended On Demand libraries of entire seasons of hit shows, old and new, from premium channel apps like HBO GO® and SHOWTIME ANYTIME®.

https://www.optimum.net/pages/alticeone/app.html

32. Upon initial operation, the STB is connected to a device having a screen (e.g., a television). The user then activates their STB with their Altice account information, such as account number and phone number. On information and belief, the STB communicates with Altice servers to register a Device Identifier associated with the user account.

33. A user may then download and install the Optimum TV or Altice One application on their mobile device (e.g., a smartphone). The mobile application allows users to discover and connect to their STB device, by way of a synchronization code or unique identifier. On information and

belief, Altice utilizes a "Device ID," "Login ID," and IP Address to identify and associate the STB. The STB and mobile application communicate via a server intermediary that associates the two devices. On information and belief, the mobile devices' messages include this synchronization code or unique identifier, and the server uses this information to route messages to the desired STB.



https://www.optimum.com/optimum-tv

34. Users may then use the mobile application to browse content. The mobile application presents content on the mobile device screen by title, image, and other metadata such as series seasons and episodes. Users can navigate the mobile application interface to see different content options available to them via their account. On information and belief, the mobile application retrieves content options and information from a remote Altice server.



https://www.optimum.net/FAQ/#/answers/a_id/4005?welcome-to-optimum

35. By browsing content on the mobile application, users may find and select the content they wish to view. Upon finding their desired content, users may pick the content on the mobile application and send a message to the server including information identifying the media and its respective media player. The server communicates the information to the STB so the STB can effect the user's commands, for instance, by loading the content and media player, and beginning playback of their selected TV show.



Screenshot of Optimum TV app showing device selection and content selection.

36. Users may also use the same mobile application to control playback of content. On information and belief, initial content selection is accompanied by a "play" command, so when a user selects content it automatically begins playing. Further, a user may send play/pause, rewind, fast-forward, and seek commands from the mobile application. On information and belief, the

mobile application sends these messages to the server system, which translates or converts them into commands each particular media player can execute.

https://play.google.com/store/apps/details?id=com.optimum.unity.mobile.prod&hl=en_US&gl=US
https://www.optimum.net/FAQ/#/answers/a_id/4005?welcome-to-optimum

37. Defendants provide media from various sources, including Live TV channels, Video on Demand, DVR, and internet media.[7] Users may select content from any of these sources via the mobile application. The mobile device communicates to the server what media player is required for the specified content. The server system then relays instructions to the STB device to load the corresponding media player. For instance, on information and belief, Live TV and Video on Demand use different media codecs. Different media players handle these codecs, and allow for similar viewing experiences for the end user.

38. Each of the steps discussed above is either performed by or otherwise attributable to Defendants. To the extent another actor performs any of these steps, Defendants direct or control that performance, conditioning participation in the activity or the receipt of a benefit upon performance of the patented method steps, and establishing the manner or timing of that performance. Additionally, Defendants profit from their infringement and have the right and

[7] https://www.optimum.com/optimum-tv

ability to stop or limit the infringement. For instance, Defendants test and demonstrate the accused functionality, including in advertisements. Further, Defendants advertise and demonstrate to customers that the infringing method steps will be performed, as shown above. Further, Defendants cause automatic updates to the Altice One and Optimum TV systems. As discussed below, the functionality advertised and directed by Defendants infringes the Touchstream Patent, and on information or belief, is known by Defendants to do so.

**COUNT I: INFRINGEMENT OF THE ’251 PATENT**

39. Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-38, *supra*.

40. Defendants directly infringe at least claim 1 of the ’251 patent by performing the methods described in ¶¶ 31-38, *supra*.

41. For example, Defendants perform the machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media players. *See*, *e.g.*, ¶¶ 32-33, 36-37, *supra*. Defendants further assign, by a server system, a synchronization code to the display device. *See, e.g.*, ¶ 33 *supra*. Defendants further receive, in the server system, a message from a personal computing device that is separate from the server system and separate from the display device, wherein the message includes the synchronization code. *See, e.g.*, ¶ 33, *supra*. Defendants further store, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code. *See, e.g.*, ¶ 33, *supra*. Defendants further receive, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player. *See, e.g.*, ¶¶ 35-

37, *supra*. Defendants further convert, by the server system, the universal playback control command into corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player. *See, e.g.*, ¶ 36, *supra*. Defendants further store, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command. *See, e.g.*, ¶ 36, *supra*.

42. Defendants' infringement of the '251 patent has been, is, and continues to be willful, including Defendants' infringement of at least claim 1 as described at ¶¶ 23-28, *supra*.

43. Touchstream has been and will continue to be irreparably harmed by Defendants' infringing acts, requiring the entry of a permanent injunction to prevent Defendants' further infringement of the '251 patent because Touchstream does not have another adequate remedy at law.

**COUNT II: INFRINGEMENT OF THE '751 PATENT**

44. Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-43, *supra*.

45. Defendants directly infringe at least claim 1 of the '751 patent by performing the methods described in ¶¶ 31-38, *supra*.

46. For example, Defendants perform the computer-implemented method for remotely presenting various types of content. *See, e.g.*, ¶¶ 31-38, *supra*. Defendants further obtain, by the

content presentation device, a synchronization code association with the content presentation device. *See*, *e.g.*, ¶ 33. Defendants further store, by a remote server, an association between the content presentation device and remote device. *See, e.g.*, ¶ 33. Defendants further receive, by the content presentation device, a message from the server device based at least in part on the stored association and a message including at least one command having been sent from the associated remote computing device. *See, e.g.*, ¶¶ 33, 35-36. Defendants further select, by the content presentation device, a media player application from a plurality of media player applications based at least in part on the format of the message from the remote device. *See*, *e.g.*, ¶¶ 36-37. Defendants further control, by the content presentation device, the selected media player based on the command from the remote device. *See, e.g.*, ¶ 36.

47. Defendants' infringement of the '751 patent has been, is, and continues to be willful, including Defendants' infringement of at least claim 1 as described at ¶¶ 23-28, *supra*.

48. Touchstream has been and will continue to be irreparably harmed by Defendants' infringing acts, requiring the entry of a permanent injunction to prevent Defendants' further infringement of the '751 patent because Touchstream does not have another adequate remedy at law.

**COUNT III: INFRINGEMENT OF THE '934 PATENT**

49. Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-48, *supra*.

50. Defendants' directly infringe at least claim 1 of the '934 patent by performing the methods described in ¶¶ 31-38, *supra*.

51. For example, Defendants perform the method of controlling playback of various types of content. *Id.* Defendants further provide, by a media receiver, a unique identification code of the media receiver to a computing device in communication with a server system. *See, e.g.*, ¶ 33.

Defendants further, based on the provided unique identification code, receives, by the media receiver via the server system, a set of messages from the computing device, the messages referencing a piece of content associated with a first type of media playing application of a plurality of media playing application types, and including a set of commands converted from a universal format defined by the computing device to a first format that corresponds to the first type of media playing application. *See*, *e.g.*, ¶¶ 35-37. Defendants further, in response to receiving the set of messages, select, by the media receiver, the type of media playing application from a plurality of media playing application types based at least in part on its associations with the piece of content referenced in the received set of messages. *See, e.g.*, ¶¶ 35-37. Defendants further control, by the media receiver, how the selected type of media playing application plays the referenced piece of content based on at least one command of the converted set of commands included in the received set of messages. *See*, *e.g.*, ¶¶ 36-37.

52. Defendants' infringement of the '934 patent has been, is, and continues to be willful, including Defendants' infringement of at least claim 1 as described at ¶¶ 23-28, *supra*.

53. Touchstream has been and will continue to be irreparably harmed by Defendants' infringing acts, requiring the entry of a permanent injunction to prevent Defendants' further infringement of the '934 patent because Touchstream does not have another adequate remedy at law.

## JURY DEMAND

54. Touchstream demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Touchstream requests entry of a judgment in its favor and against Defendants as follows:

a)  Judgment that Defendants have directly infringed one or more claims of the Touchstream Patents;

b)  An award of damages to compensate for Defendants' infringement, including damages pursuant to 35 U.S.C. § 284, as well as prejudgment and post-judgment interest;

c)  An award of costs and expenses in this action, including an award of Touchstream's reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

d)  A permanent injunction restraining and enjoining Defendants, and their respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants who receive actual notice of the order by personal service or otherwise, from any further sales or use of their infringing products and/or services and any other infringement of the Touchstream Patents;

e)  A finding that Defendants have willfully infringed and are willfully infringing one or more claims of the Touchstream Patents;

f)  A finding that this case is an exceptional case, and awarding treble damages due to Defendants' deliberate and willful conduct, and ordering Defendants to pay Touchstream's costs of suit and attorneys' fees; and

g)  For such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

Dated: May 12, 2023

Respectfully submitted,

*/s/ Michael W. Gray*

Michael W. Gray (State Bar No. 24094385)
**SHOOK, HARDY & BACON L.L.P.**
JPMorgan Chase Tower
600 Travis St, Suite 3400
Houston, TX 77002-2926
Phone: (713) 227-8008
Fax: (713) 227-9508
Email: mgray@shb.com

***Counsel for Plaintiff***
***Touchstream Technologies, Inc.***

**CERTIFICATE OF SERVICE**

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that on May 12, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Michael W. Gray*